UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ANNE MAJOCHA | : | |
| | : | CIVIL ACTION NO. |
| | : | |
| Plaintiff, | : | 3:16-CV-00742(VLB) |
| | : | |
| v. | : | |
| | : | |
| EVERSOURCE ENERGY SERVICE | : | |
| COMPANY f/k/a NORTHEAST UTILITIES | : | JUNE 29, 2017 |
| SERVICE COMPANY | : | |
| | : | |
| Defendant. | : | |
| | : | |

### DEFENDANT'S LOCAL RULE 56(a)(1) STATEMENT OF MATERIAL FACTS

**I.   PRELIMINARY STATEMENT**

Pursuant to Local Rule of Civil Procedure 56(a)(1), the defendant, Eversource Energy Service Company ("Eversource" or "Defendant"), hereby submits that the following material facts are not in dispute for purposes of its Motion for Summary Judgment.  Attached hereto is Exhibit A, which is a Table of Contents listing all other exhibits.

**II.   STATEMENT OF UNDISPUTED MATERIAL FACTS**

1.   The plaintiff, Anne Majocha ("Plaintiff" or "Majocha"), was hired by Northeast Utilities, the predecessor to Eversource, in 1998.  Her first position was as an Associate Scientist in the Environmental Department. (Exhibit B-1.)  In November, 2000 she requested, and was granted, a transfer to the Economic and

Load Forecasting Department as an Associate Economic and Load Analyst. (Exhibit B-2.)

2.      In December 21, 2006 Plaintiff requested, and was granted, a transfer to the Benefits division of the Human Resources Department with the title HR Consultant.  (Exhibit B-3.)  Eversource confirmed Plaintiff's transfer to the HR Benefits Department on or about December 21, 2006 in a letter that provided: "This letter should not be interpreted as a guarantee of employment for any specific duration.  Your employment with the Company will be employment at will, which means that your have the right to terminate your employment at any time and for any reason, and the Company may do the same." (Id.)

3.      In April, 2012, Northeast Utilities[1] merged with NStar Electric and Gas Company.   (Exhibit C, Peloquin Affd. ¶4.)   The merger resulted in a larger company with more employees, and as a result, employees in the Human Resources Department were reassigned job responsibilities, one of whom was Plaintiff.  (Id.)

4.      Starting in September, 2012, Plaintiff's supervisor was Michael Synan.  (Exhibit D, Synan Tr. p. 7:11.)  Prior to September, 2012, Plaintiff's supervisor was Michael Ehredt.  (Exhibit E, Majocha Tr. p. 25:18) (Synan Tr. p. 19:8.)  Plaintiff was transferred to Synan's supervision as part of the reorganization stemming from the merger.  (Synan Tr. p. 11:16-19.)  Plaintiff was

---

[1]  The corporate name "Northeast Utilities" was changed to "Eversource" in 2014.

2

one of three employees reporting to Synan whose job responsibilities were transitioning in the fourth quarter of 2012. (Synan Tr. pp. 18:10, 25:2.)

5.      In late 2012, Synan assigned Plaintiff tasks that required training for her to do her job properly. (Synan Tr. p. 17:13.) Plaintiff was to start the necessary training in the fourth quarter of 2012. (Synan Tr. pp. 12:20, 14:16.) Synan observed that Plaintiff was resistant to meeting with her co-workers in order to be trained in the fourth quarter of 2012. (Synan Tr. p 14:6 - 14:21.)

6.      Synan talked to Plaintiff in the fourth quarter of 2012 about the importance of working with her team to learn new responsibilities. (Synan Tr. p. 25:4-6.) He also talked to Plaintiff in the fourth quarter of 2012 about not showing up for training. (Synan Tr. pp. 16:20.) Also in the fourth quarter of 2012, Plaintiff responded to Synan that she was too busy to meet with co-workers for training; or, she would just walk away when Synan tried to discuss the issue with her. (Synan Tr. p. 25:9-18.)

7.      Bill paying was Plaintiff's only responsibility at Eversource from January-March 2013. (Majocha Tr. pp. 59:24 – 60:2.) The bills that Plaintiff was responsible to pay and which were going unpaid were payments for medical, dental, life insurance for current employees, and finding of retirement trusts for pension payments. (Synan Tr. p. 109:15-19.)

8.      Synan told Plaintiff in early 2013 that she needed to start taking responsibility for her job. (Synan Tr. p. 31: 11-16.) Synan told her this multiple

3

times prior to her performance review in February 2013 (Synan Tr. p. 42:10-16), and at her performance review in February 2013, Synan told Plaintiff that she needed to work with her team to be successful.  (Synan Tr. pp. 41:24 – 42:2.)  The performance review document dated February 22, 2013 emphasized the need for Plaintiff to pay bills timely and to build and maintain strong relationships with her co-workers.  (Exhibit B-4.)  Failure to pay bills on a timely basis could have led to termination of employee benefit coverage.  (Synan Tr. pp 118: 7-14.)

9.     After February 22, 2013, Plaintiff's supervisor Synan contacted Nancy Lema, an Eversource Human Resources Business Partner, when he discovered that bills Plaintiff was supposed to be paying were not being paid, causing Eversource to be in payment arrears with vendors.  (Synan Tr. p. 63:10-16.)

10.     Synan had learned the bill payments were in arrears because he received a dozen late notices from vendors via mail or email by the end of March, 2013. (Synan Tr. pp. 65:25, 66:10.)  The late notices were attributable to Plaintiff's failure to pay the bills in a timely manner.  (Synan Tr. p. 66:6-24.)  Some of the bills had not been paid since January 1, 2013 (Synan Tr. p. 67:4), the date from which Plaintiff was to be responsible to see that the bills were paid.  (Synan Tr. p. 68:19.)  Plaintiff was aware that vendors had been calling asking for payment. (Majocha Tr. p. 57:24.)

4

11.     On March 25, 2013, Synan sent an email to Plaintiff to follow up on an earlier conversation concerning the mandatory nature of Synan's direction to Plaintiff to meet with a co-worker, and explained "If you do not want to attend or do not meet with Brenda, we can have a different discussion."  (Exhibit F-1.) Plaintiff's comment regarding the email from Synan was "I've been scolded." (Exhibit F-2.)

12.     Synan and  Lema, met with Plaintiff on or about March 28, 2013 (Synan Tr. p. 83:8-12) (Majocha Tr. p. 86:6), wherein Synan and Lema discussed with Plaintiff the importance of making sure payments were timely, and the importance of communicating the status of payments.  (Synan Tr. pp. 83:15-19, 84:6.)  Also discussed with Plaintiff was the fact that Plaintiff failed to appear for training the day before.  (Synan Tr. p. 84:14.)  Synan testified that this meeting constituted a verbal warning.  (Synan Tr. p. 88:5-17.)   Lema sent an email to Majocha itemizing the matters discussed, including the priority to pay the bills, meet with co-workers, and providing Synan with a weekly report.  (Exhibit F-3.)

13.     Synan recalled that Plaintiff's bill paying performance did not improve as a result of the March 28 meeting (Synan Tr. p. 104:24) and Synan had to personally intervene to get the late bills paid with assistance from other employees.  (Synan Tr. p. 105:17.)

14.     At the end of April, 2013, Synan discovered more unpaid bills (Synan Tr. pp. 105:23, 108:8).  Synan met with Plaintiff in April, 2013 concerning the

unpaid bills.  (Synan Tr. p. 106:18.)  Synan recalled that Plaintiff stopped responding, or fully responding, to his emails.  (Synan Tr. pp. 92:4 – 93:12.)

15.     On May 10, 2013, Synan and Lema again met with Plaintiff which the Plaintiff memorialized in an email:  "Said he [Synan] will start giving me deadlines and asked if I am correct for this job….Accused me of not answering his questions in emails."  (Exhibit F-4.)  On May 22, 2017, Synan sent an email to Majocha itemizing all of the performance issues Majocha had been told about since March, and explaining that she had not followed through on the work performance and reporting issues.  (Exhibit F-5.)

16.     By the end of May, 2013, Plaintiff was not showing improvement in paying the bills.  (Synan Tr. p. 107:8.)  In fact, Plaintiff's performance was worse in that she refused to respond to Synan regarding the list of bills that needed to be paid, so Synan could only gauge the severity of the situation from late notices. (Synan Tr. p. 107:4-25.)

17.     Plaintiff alleges that she told Synan that she had Lyme disease in March, 2013 (Majocha Tr. p. 80:21), but she admits that there was no diagnosis of Lyme disease until April 26, 2013.  (Majocha Tr. pp. 73:21, 76:14-19, 79:7.) Further, Plaintiff's only allegation of a request for medical leave relative to the undiagnosed alleged Lyme disease was for one doctor's appointment more than a month away from the date Plaintiff alleges she told Synan she had Lyme disease.  (Complaint ¶ 15-17; Majocha Tr. pp. 80:21-26, 81:1-3.)

6

18.     Though Plaintiff was diagnosed with Lyme disease on April 26, 2013 (Majocha Tr. p. 105:4), Plaintiff did not submit Family Medical Leave Act ("FMLA") leave applications until May 14, 2013. (Majocha Tr. p. 101:12) (Exhibit G-1.) Plaintiff believed her job with Eversource was in jeopardy by mid-May, 2013. (Majocha Tr. pp. 19:4-21, 22:6.)  She thought it was necessary to find another position at Eversource "to save my pension." (Majocha Tr. p. 19:8.)  Additionally, Plaintiff noted that she had to choose between catching up on her work, or preparing for an interview, in a May 10, 2013 email.  (Exhibit F-4.)

19.     The May 14, 2013 FMLA request was the third FMLA leave request from Plaintiff while an employee of Eversource.  Plaintiff's prior FMLA requests were made on February 22, 2001 and on January 6, 2004, and both requests were honored and leave was taken by Plaintiff each time.  (Exhibit. G-2.)  Plaintiff did not claim there had been retaliation relative to those two FMLA protected leaves of absence.  (Majocha Tr. P. 100:18.)

20.     Synan did not learn that Plaintiff had requested FMLA leave until Plaintiff sent him an email on June 4, 2013 informing him that she was taking an FMLA day that day.  (Synan Tr. pp. 37:5, 38:11, 38:18, 111:13.)  Plaintiff sent the email to Synan so she would have evidence that he knew of the FMLA:  "As proof that I told Mike Synan that I was out on FMLA."(Majocha Tr. 135:3-4.)

21.     Bernard Peloquin was the Director to whom Michael Synan reported from 2000 through June 5, 2013.  (Peloquin Affd. ¶ 3.)  Peloquin managed

7

employees directly and indirectly who were given special projects relative to the 2012 merger in addition to the day to day tasks of maintaining HR benefits for the 9000 employees of the combined entities, together with employee benefits staff administered various programs on behalf of thousands of retirees and dependents.  (Peloquin Affd. ¶ 5.)

22.    Peloquin did not meet Majocha until after the Northeast Utilitiesmerger with NStar.  She was known to him to have achieved an education and training in financial matters and was experienced in dealing with financial, billing and cost functions as part of her work duties and based on her credentials, she appeared to have the knowledge to administer work in these areas.  (Peloquin Affd. ¶ 6.)

23.    Peloquin worked directly with Majocha for the first time in the spring of 2013 to complete the task of creating a full, accurate and timely report which was required to be filed with the New Hampshire Public Utilities Commission, providing the salaries and benefits of executives for the merged Eversource organization (the "Filing").  (Peloquin Affd. ¶  7.)

24.    Peloquin found Plaintiff's performance in the tasks assigned to her relative to the Filing to be extremely disappointing.  Her function was to coordinate the gathering of information from internal and external sources and to oversee the reasonable completeness of this information.  (Peloquin Affd. ¶ 8.) Peloquin's observations during the process of compiling information for the

Filing were that Plaintiff evaded responsibility, failed to be diligent in coordinating the Filing, failed to properly schedule and prioritize activities, failed to communicate to Peloquin and to other team members information necessary to complete the Filing, and did not review information that was being submitted for completeness.  Because of her poor performance, Plaintiff nearly caused Eversource to miss the June 1, 2013 deadline for the Filing.  (Id.)

25.    Peloquin was also frustrated with what he perceived as Plaintiff's poor attitude and insubordinate behavior toward him.  (Exhibit C-1.)  Peloquin had asked her to be sure to "cc" emails to her direct supervisor  Synan so he would know what she was working on, but she failed and refused to do so, making his job and  Synan's job of coordinating work much more difficult.  (Peloquin Affd. ¶ 9.)  Peloquin also observed that Plaintiff failed to respond on a timely basis to requests for updates and status of the Filing preparation.  Peloquin was also informed by Synan that Plaintiff was not doing a good job of keeping up with bill payments.  (Id.)

26.    Peloquin believes that the merger of Northeast Utilities and NStar created a greater workload for the employees who reported to him in 2013, but he also believes that Plaintiff was not given a workload in 2013 greater than any other employee of her rank in the HR Benefits Department.  In fact, Peloquin recalls that one of her most time consuming responsibilities, the creation of the

annual Northeast Utilities' calendar was eliminated in 2012-13, which freed her to do more work that would support the merger.  (Peloquin Affd. ¶ 10.)

27.    Peloquin made the decision to terminate Plaintiff's employment with Eversource because of his observations of her poor performance and poor attitude, and the negative reports he received from Synan.  On June 5, 2013, Peloquin personally attended a meeting with Plaintiff and Lema where he told Plaintiff that her employment was terminated effective immediately.  At that meeting, he explained to Majocha that her performance was inadequate and unresponsive in coordinating the Filing.  (Peloquin Affd. ¶ 11, Exhibit C-2.)

28.    At the time he terminated her employment, Peloquin was not aware that Plaintiff was suffering from Lyme disease or that she had made a request for FMLA leave, though he was aware that she had taken time off in May, 2013, which she represented to him was to care for a sick child.  (Peloquin Affd. ¶ 12.)

29.    Synan was not a participant in the June 5, 2013 termination meeting, nor was he told it was taking place; though in late May, 2013 Synan was asked for his opinion by Lema and Anne Tavarez, Manager, Employee Relations for Eversource Human Resources, whether Plaintiff should be terminated and he responded in the affirmative because Plaintiff had failed to do her job.  (Synan Tr. pp. 61:16-19, 62:2, 112:2-15.)

30.     Plaintiff testified "I was terminated obviously for executive comp issues which I wasn't supposed to be even working on."  (Majocha Tr. p. 120:12-13.)

31.     Plaintiff's description of alleged "retaliation" is not described by her in connection with her request for leave of FMLA, or for taking an FMLA day.  ("I think they discriminated [sic against] me for, you know, my disability.") (Majocha Tr. p. 118:24.)  ("I believe that because they knew about my Lyme, they started retaliating against me.")  (Majocha Tr. p. 119: 5-6.)  ("What kind of performance do they expect from somebody?")[2]  (Majocha Tr. pp. 101:23 – 102:24.)

32.     The only evidence Plaintiff can proffer to prove that Eversource engaged in FMLA retaliation against her, is that her employment was terminated one day after she took her first FMLA day.  (Majocha Tr. pp. 123:3, 153:11.)

---

[2] .     **Majocha Tr. pp. 101:23 -102:24.  Q. "Okay. Retaliation, what retaliation do you feel occurred in this case?"
A. "Well, there was the comments from Mike Synan: What's wrong with you, why can't you do this, we gave you a nonexempt job and made it exempt and why can't you do it, you know, you're not a team player, you know. And then, you know, taking [sic] giving me all the executive comp work above and beyond what I was doing when they know fully well that I was already behind.  Why would you do that to somebody, give them more work? What kind of performance do they expect from somebody?"**

**DEFENDANT,**
**EVERSOURCE ENERGY SERVICE**
**COMPANY**


**By:**     ***/s/ Honor S. Heath***
            **Honor S. Heath ct10446**
            **Amy Leete Van Dyke ct23181**
            **Eversource Energy Service Company**
            **Legal Department**
            **107 Selden Street**
            **Berlin, CT 06037**
            **honor.heath@eversource.com**
            **Tel. No.: (860) 665-4865**

12

<u>**CERTIFICATION**</u>

**This is to certify that on this 29th day of June, 2017, a copy of the foregoing**

**Rule 56(a)(1) Statement of Material Facts, together with all Exhibits was sent by**

**operation of this Court's electronic filing system, and via Federal Express, to:**

**James V. Sabatini, Esq.**
**Sabatini & Associates**
**One Market Square**
**Newington, CT  06111**


                              <u>*/s/ Honor S. Heath*</u>
                              **Honor S. Heath**

13