UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ANNE MAJOCHA,<br>　　Plaintiff, | : <br> : <br> : | No. 3:16-CV-00742 (VLB) |
| v. | : <br> : | February 21, 2018 |
| EVERSOURCE ENERGY SERVICE<br>COMPANY f/k/a NORTHEAST<br>UTILITIES SERVICE COMPANY,<br>　　Defendant. | : <br> : <br> : <br> : <br> : | |

## MEMORANDUM OF DECISION ON MOTION FOR SUMMARY JUDGMENT [DKT. 22]

This action involves the employment termination of Ms. Anne Majocha ("Plaintiff" or "Majocha"), who worked for Defendant Eversource Energy Service Company ("Eversource"), formerly known as Northeast Utilities Service Company ("Northeast Utilities"), since 1998. Plaintiff was diagnosed with Lyme disease on April 26, 2013, and she was terminated on June 5, 2013. The Complaint raises both interference and retaliation claims in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601, *et seq.* Defendant moved for summary judgment on both counts, and Plaintiff only challenges the retaliation claim. For the foregoing reasons, the Court DENIES summary judgment as to Count I and GRANTS summary judgment as to Count II.

## I. Background

In 1998, Northeast Utilities hired Ms. Majocha as an Associate Scientist in the Environmental Department. [Dkt. 24 (Def. L. R. 56(a)(1) Stmt.) ¶ 1; Dkt. 27-2 (Pl. L. R. 56(a)(2) Stmt.) ¶ 1]. Two years later, she requested and received a transfer to the Economic and Load Forecasting Department as an Associate Economic and

1

Load Analyst. [Dkt. 24 ¶ 1; Dkt. 27-2 ¶ 1]. She took FMLA leave on February 22, 2001 and January 6, 2004. [Dkt. 24 ¶ 19; Dkt. 27-2 ¶ 19]. On December 21, 2016, Ms. Majocha was transferred to the Benefits Division in the Human Resource ("HR") Department and worked as an HR Consultant. [Dkt. 24 ¶ 2; Dkt. 27-2 ¶ 2].

Northeast Utilities had a system of internal personnel policies and procedures that applied throughout the company. *See* [Dkt. 29-1 (Reply Ex. B-6, NU Protocol) at ES5021]. These including the Counseling and Discipline policy, which provided two "corrective action tools available to management": (1) job performance counseling and (2) stepwise discipline. The policy outlines these two provisions as follows.

- <u>Job Performance Counseling</u> is not disciplinary action. Rather, job performance counseling is used to determine areas for improvement and enable management and the employee to establish a timetable to correct the problem.
- <u>Stepwise Discipline</u>, which relies on four steps of increasing severity (verbal, written, suspension and termination) depending on the severity of the incident, is intended to achieve corrective positive behavior versus punishment, with the purpose of:
  - increasing employee efficiency and safety, and
  - protecting the investments the Company has in the employee, property, materials and workplace.

[Dkt. 27-7 (Opp'n Ex. P3, NU Counseling and Discipline Policy)]. "All disciplinary action (written warning and above) must be reviewed by the Human Resources' Labor Relations Department for consistency of application." *Id.*

Northeast Utilities merged with NStar Electric and Gas Company in April 2012; its name was changed to Eversource two years later. [Dkt. 24 ¶ 3; Dkt. 27-2 ¶ 3]. As a result of this merger, many employees, including Ms. Majocha, were reassigned to different job responsibilities. [Dkt. 24 ¶ 3; Dkt. 27-2 ¶ 3]. Ms.

Majocha's supervisor changed from Mr. Michael Ehredt ("Ehredt") to Mr. Michael Synan ("Synan") in September 2012 as a result of the reassignment. [Dkt. 24 ¶ 4; Dkt. 27-2 ¶ 4]. Mr. Synan testified that Ms. Majocha received a training during the fourth quarter of 2012 that extended into 2013. [Dkt. 24-10 (Mot. Summ. J. Ex. D, Synan Dep.) at 12:7-21]. Mr. Synan also testified that she was not an active participant, did not go to certain trainings, and was not willing to work with coworkers. *See id.* at 13:16-14-3.

Ms. Majocha testified that she requested that her primary care physician refer her to a Lyme disease specialist in approximately January 2013. *See* [Dkt. 24-11 (Mot. Summ. J. Ex. E, Majocha Dep.) at 74:2-76:12]. She had to wait approximately three months for an appointment. *Id.*

In February 2013, Ms. Majocha received a merit-based pay raise and bonus. [Dkt. 24-10 at 38:19-39:1, 39:25-40:2]. As Ms. Majocha's supervisor and manager, Mr. Synan played a role in her raise as he gave her "a rating, a performance review, and agreed with the financial recommendation." *Id.* at 39:8-14. The rating also corresponded to her bonus. *Id.* at 40:6-9. Mr. Synan gave her a favorable review for the time period since September 2012. *Id.* at 19-24. Specifically, the 2012 Performance Review, dated February 22, 2013, stated the following:

> Anne's new responsibilities will be heavily focused on payment of benefit related bills, budgeting and reporting and requests related to both items. These are extremely important functions due to the need to pay bills timely, from the correct asset bucket and track. In this role Anne will also need to build and maintain strong relationships with her internal peers and in accounting/budgeting/treasury and with contacts at NU's many external benefit vendors. Annie has approached her new role with great enthusiasm and I am sure she has the ability and aptitude to do the job well. I would encourage Anne to take the time to listen carefully to her co-workers ideas and thoughts and to not

**overcomplicate processes – keep it simple! Anne has expressed interest in learning more abo[u]t the various benefit plans and will have the opportunity to grow that knowledge in her new role. Teamwork will be the key to knowledge growth and success in Anne's new role.**

**Also, I would like to thank Anne for jumping in to help the team as we experienced a very hectic post-open enrollment period.**

[Dkt. 24-6 (Mot. Summ. J. Ex. B-4 (2012 Perf. Rev.) at ES3055].

Mr. Synan believes he contacted Nancy Lema ("Lema") in the HR Department at the end of February 2013 after her discovered "that bills weren't being paid and that we weren't current with our bills." [Dkt. 24-10 at 63:4-12]. By the end of March, there were roughly 12 bills that had not been paid and were attributable to Ms. Majocha. *Id.* at 65:22-67:3. This bills had accrued since the beginning of January. *Id.* at 67:2-19.

At some point between 2012 and March 2013[1], Ms. Majocha notified Mr. Synan that she believed she had Lyme disease. Mr. Synan testified to the following:

I asked her what that meant for her and she told [me] that she had a lot of doctor's appointments and I asked her to let me know when she had appointments. And I remember telling her about someone I knew that had Lyme disease and that it took a couple of years for them to get a right mix of medicine and physical therapy and I asked her – I remember discussing did she live near the woods, general how do you think you got it type of thing.

---

[1] Ms. Majocha testified that she first told Mr. Synan about her Lyme disease in March 2013. [Dkt. 24-11 at 71:5-21]. Mr. Synan believes that Ms. Majocha told him about her Lyme disease in 2012 during a casual conversation while they were working together. [Dkt. 24-10 at 33:14-23]. The parties generally refer to Ms. Majocha's testimony as the date on which Mr. Synan became aware of her suspected disease.

*Id.* Mr. Synan acknowledged that Ms. Majocha told him she would have to miss time from work to see doctors, and stated, "She said that it impacted her in that she had doctor appointments." *Id.* at 35:7-12. At this time, Ms. Majocha had not yet been diagnosed with Lyme disease, but she believed she had the disease because she started to have autoimmune disorders such as "Hashimoto's Sjogren's, then rheumatoid arthritis. . . , floaters in [her] eyes, sensitivity to light, pain in [her] shoulders, achy joints . . . , double vision once in a while, sensitivity to sound," and weakness when she walked up the stairs. [Dkt. 24-11 at 74:8-20]. Ms. Majocha testified that Mr. Synan asked on three separate occasions "if just a round of antibiotics would clear up the Lyme." [Dkt. 24-11 at 70:17-73:1]. Mr. Synan disputes these conversations happened. *Id.* at 40:15-41:15, 89:16-18.

On March 25, 2013, Ms. Majocha emailed Mr. Synan in what appears to be a response to Mr. Synan's request for her to meet with Brenda Hoffman ("Hoffman"), an HR Benefits Representative who trained Ms. Majocha prior to being transferred to a different position. *See* [Dkt. 24-13 (Mot. Summ. J. Ex. F-1, Emails 3/25/2013)]. Mr. Majocha indicated, "I don't have time to meet with Brenda this week," due to her need to complete certain ongoing projects. *Id.* at P001585. Mr. Synan responded, "I appreciate the fact that everyone is busy, but following up to our conversation of last week this meeting will occur and is not open for discussion. I will be sending a meeting invite to hold the time on your calendar. If you do not want to attend or do not meet with Brenda, we can have a different discussion." *Id.* Mr. Majocha then wrote, "I only asked you to wait one week while I try to wrap up the VEGA and quarter end items. I would be happy to meet with Brenda on April

3rd. *Id.* On the same day, Ms. Majocha also forwarded Mr. Synan's email to her husband, Michael Steinbrecher, saying "I've been scolded. ." [Dkt. 24-14 (Mot. Summ. J. Ex. F-2, Forwarded Emails 3/25/13) at P001590]. Mr. Steinbrecher responded, "Sorry, you gave it a valiant effort, and now you have it in writing (e-mail) that you explained how busy you are and he just didn't want to listen." *Id.*

Three days later, Ms. Majocha met with Mr. Synan and Ms. Lema. *See* [Dkt. 24-15 (Mot. Summ. J. Ex. F-3, Emails 3/29/13)]. The following day, Ms. Lema memorialized the conversation in an email, wherein she listed three action items agreed to by the three of them:

- **Priority is to pay the bills**
- **Weekly meetings will take place among you, Mike, Brenda, and Mike E, to discuss the most effective way to transition Brenda's work to you. Also, Mike will provide you with direction if necessary around prioritizing your work along with answering any questions you might have related to other concerns**
- **You will provide Mike with a weekly schedule to identify any issues with payment, etc.**

*Id.* Mr. Synan testified that they also discussed "her not showing up for training the day before making the employee that was supposed to train her feel very uncomfortable when asked about the training." [Dkt. 24-10 at 84:14-17]. Mr. Synan described this meeting as "more than a job counseling at that point; it was a verbal discussion as why it was important." *Id.* at 84:23-25.

Mr. Synan testified that the outstanding bills were paid due to the efforts by him and other people. *See id.* at 105:12-22. In April 2013, he continued to discover additional unpaid bills, although he could not estimate how many. *See id.* at 105:19-106:4.

On April 26, 2013, Dr. Campos, the Lyme disease specialist, clinically diagnosed Ms. Majocha with Lyme disease. *See* [Dkt. 24 ¶ 18; Dkt. 27-2 ¶ 18].

Senior Accountant, Joanna Purtell, gave Ms. Majocha 401K payroll data project assignment on May 2, 2013. *See* [Dkt. 27-14 (Opp'n Ex. P10, 401K Email 5/2/13) at P000006]. Ms. Majocha emailed Mr. Synan asking that another person do the screen prints. *Id.* at P000005. Mr. Synan indicated that "folks should pitch in as they have in prior years," *id.*, to which Ms. Majocha responded that it had been her role but that she did not have time to do the project because of her new position, *id.* at P000004. Instead, she said, "Please delegate to another person." *Id.* Mr. Synan indicated that they should speak when he is next in Connecticut and that his "expectation is that [she] should be able to continue to help out on the audits." *Id.*

On May 10, 2013, Ms. Majocha emailed her husband, Mr. Steinbrecher, about a conversation she had with Mr. Synan that day. [Dkt. 24-16 (Mot. Summ. J. Ex. F-4, Emails 5/10/13) at P005096]. Mr. Synan purportedly told her she "took 1 ½ hour lunch on March 28, 2013," which she denied, stating, "I remember this was the end of the quarter week and I wanted to get as much in as possible before the quarter end." *Id.* Mr. Synan also stated "he will start giving [her] deadlines and asked if [she] is correct for this job." *Id.* at P005097. Ms. Majocha "reminded him that [she] was still doing items from [her] old job. This includes regulatory and exec compensation." *Id.* Mr. Synan also "[a]ccused [her] of not answering his questions in his emails." *Id.* Mr. Steinbrecher responded, "I thought you have been asking him for deadlines all along…. No reply each time you asked. Deadlines could be a

good thing…. When he gives you more work you can give the deadline back in your response." *Id.* at P005096. Ms. Majocha then stated, "I can give him another list of all that is on my plate, ask him exactly what he wants me to do first. I have two choices… I can work 80 hours to try and catch up or I can study for my excel exam and create powerpoints for my interview. Hmmmm." *Id.*

On May 12, 2013, Mr. Synan sent an email to himself with the subject title of "Lema talking points." [Dkt. 27-8 (Opp'n Ex. P4, Synan Email 5/12/13) at ES4226]. He wrote the following:

> I refuse to enter a progressive discipline arrangement with Anne
>
> She continues to do only what she wants.
>
> It is extremely frustrating as a manager to have responsibility for functions but not the tools to track, and impossible with an employee like Anne
>
> I asked her to pay [ ] Bill on April xx – still not paid
>
> If you won't term her, return her and the bill paying responsibility for NU to former Director and Manager – no perf review since 2006, Director told me on day one that she was a problem (granted he is fairly new and probably did not have time to deal with.
>
> If you tell me progressive discipline – I am going to ignore the bill paying function at NU – just as Anne is – because apparently there are no consequences

*Id.*

Ms. Majocha testified that she believed her job to be in jeopardy around mid-May 2013. *See* [Dkt. 24-11 at 19:16-20:6]. Mr. Synan estimates that by the end of May 2013 there were "more than a dozen" unpaid bills. [Dkt. 24-10 at 107:16-21]. Mr. Synan testified that he believes he applied the stepwise discipline for Ms. Majocha. *See* [Dkt. 24-10 at 88:5-11].

Ms. Majocha submitted her FMLA leave requests on May 14, 2013. [Dkt. 24 ¶ 18; Dkt. 27-2 ¶ 18].

On the same day, Mr. Synan sent a follow-up email about his conversation with Ms. Majocha, asking (1) for "the list of outstanding/late bills" as requested, and (2) whether she paid the TW invoice. [Dkt. 24-17 (Mot. Summ. J. Ex. F-5, Emails 5/22/13) at P004566-67]. Ms. Majocha responded the following day on May 15, 2013, with a "to-do list" rather than a list of outstanding bills. *Id.* at P004564. Mr. Synan sent a response the following week on May 22, 2013, recapping their conversation on May 10, his follow-up on May 13 and May 14, and her subsequent response. *Id.* He stated, "The response appears to be a list of various items and not entir[e]ly related to the question. This also reinforces another point of our conversation on May 10- that is that you need to provide answers more responsive to my questions." *Id.* Mr. Synan also circulated a document to track the outstanding bills and asked that she fill in the requested data by the following day. *Id.* He indicated that he had asked her to create a table of bills "[s]everal times since March" and that he needed an update regardless of whether she uses the table he previously circulated to her. *Id.* Mr. Synan recognized, however, that Eversource required a verbal discipline to be documented in writing, which he did not do; he believes Ms. Lema documented the discussion. *See* [Dkt. 24-10 at 85:1-87:25].

Dr. Campos treated Ms. Majocha on May 20, 2013. *See* [Dkt. 27-10 (Opp'n Ex. P6, Provider Cert.) at P006629]. He submitted a completed FMLA certification form for intermittent medical leave on May 21, 2013, [Dkt. 27-10 (Opp'n Ex. P6, Intermittent Leave)], and for ongoing medical leave on May 23, 2013 from June 1 to

July 31, 2013, [Dkt. 27-11 (Opp'n Ex. P7, Ongoing Leave)]. In the ongoing leave form, Dr. Campos described her symptoms as "Chronic Lyme Disease – Joint swelling and pain, neck/back pain, muscle pain and weakness, disorientation, hormonal imbalance, headaches, anxiety, depression, insomnia, light sensitivity, ears ringing. Possible I.V. treatments." *Id.* at P006225.[2] He also stated she was "[n]ot allowed to get behind in sleep, or become overtired." *Id.* Dr. Campos estimated necessary weekly treatment for one day a week between May 2013 and December 2013, [Dkt. 27-10 at P006229], and he predicted flare-ups might occur twice per month, *id.* at P006230.

Ms. Majocha worked on a project for Bernard B. Peloquin, the Director of Benefits and HR Operations, during the spring of 2013 and he concluded that "[b]ecause of her poor performance, she nearly caused Eversource to miss the June 1, 2013, deadline for filing." [Dkt. 24-7 (Mot. Summ. J. Ex. C, Peloquin Aff.) ¶ 8]. Ms. Majocha was to create a report the salaries and benefits of Eversource executives that would then be used for a filing before the New Hampshire Public Utilities Commission. *Id.* ¶ 7. Mr. Peloquin deemed Ms. Majocha's performance "extremely disappointing," because she "evaded responsibility, failed to be diligent in coordinating the Filing, failed to properly schedule and prioritize activities, failed to communicate to [him] and other team members necessary to complete the Filing and did not review information that was being submitted for

---

[2] The intermittent leave form contains largely the same information regarding symptoms: that she was "suffering of chronic fatigue immune deficiency syndrome and fibromyalgia syndrome secondary to chronic Lyme disease." [Dkt. 27-10 at P006229].

completeness." *Id.* ¶ 8. He also described her attitude as "poor" and "insubordinate." *Id.* ¶ 9.

Ms. Majocha's FMLA leave was approved on June 4, 2013. [Dkt. 24-20 (Mot. Summ. J. Ex. G-1, FMLA Approval 6/4/13)]. Ms. Sandra Monarca from the Medical Department sent the approval to Ms. Majocha, Mr. Synan, and Ms. Lema on June 4, 2013. *See* [Dkt. 27-13 (Opp'n Ex. P9 (Monarca Email 6/4/13)]. Ms. Majocha took FMLA leave that day. *See* [Dkt. 24-10 at 111:10-13; Dkt. 24-11 at 108:1-6]].

Ms. Majocha was fired on June 5, 2013. [Dkt. 24 ¶ 27; Dkt. 27-2 ¶ 27]. Mr. Peloquin stated he made the decision and personally terminated her with Ms. Lema also present in the room. [Dkt. 24-7 ¶ 11]. He stated that he based his decision on his "personal observations of her poor performance and poor attitude, and from reports [he] received from Michael Synan." *Id.* He explained during the meeting that Ms. Majocha's "performance was inadequate and unresponsive in coordinating the Filing." *Id.* ¶ 11. He was not personally aware during the filing that Ms. Majocha was suffering from Lyme disease or that she had requested FMLA leave. *Id.* ¶ 12. Although Mr. Synan was not a participant in the meeting, he knew it was going to take place. [Dkt. 24 ¶ 29; Dkt. 27-2 ¶ 29]. He told Ms. Lema and Anne Tavarez that he believed Ms. Majocha should be fired for "failure to do her job." [Dkt. 24 ¶ 29; Dkt. 27-2 ¶ 29; Dkt. 24-10 at 112:4-15]. Defendant's First Set of Interrogatories indicates that Ms. Majocha's employment termination was a "joint decision involving Bernard Peloquin, Michael Synan, Anne Tavares, legal department and Nancy Lema sometime in late May 2013." [Dkt. 27-15 (Opp'n Ex. P11, First Interrog.) at 9].

## II. Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no genuine factual disputes exist. *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). This means that "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000); *see Welch-Rubin v. Sandals Corp.*, No. 3:03-cv-00481, 2004 WL 2472280, at *4 (D. Conn. Oct. 20, 2004) ("At the summary judgment stage of the proceeding, [the moving party is] required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient.") (citing *Gottlieb*, 84 F.3d at 518); *Martinez v. Conn. State Library*, 817 F. Supp. 2d 28, 37 (D. Conn. 2011). Put another way, "[i]f there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).

A party who opposes summary judgment "cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty of Orange*, 84 F.3d 511, 518 (2d Cir. 1996). Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726–27 (2d Cir. 2010).

## III.  Analysis

The FMLA provides an "eligible employee" with the right to take twelve weeks of unpaid leave for, *inter alia*, "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D).  The FMLA prohibits employers from interfering with this right and from retaliating against an employee who asserts this right.  29 U.S.C. § 2615.  Interference and retaliation claims are two distinct claims for relief.  *See Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004).  Ms. Majocha challenges only the FMLA retaliation claim.

Defendant moves for summary judgment on two grounds: (1) that the claim is time-barred by the statute of limitations, and (2) that she fails to satisfy the *prima facie* case and cannot show pretext.  The Court will address the latter issue as it informs the former.

### A. _McDonnell Douglas Standard_

FMLA retaliation claims have been analyzed under the _McDonnell Douglas_ test, but the proper legal standard has not been resolved. _See Graziadio v. Culinary Inst. of Am._, 817 F.3d 415, 429 n.7 (2d Cir. 2016). The Court applies _McDonnell Douglas_ because Plaintiff does not argue for the application of the test articulated in _Bachelder v. America West Airlines, Inc.,_ 259 F.3d 1112, 1125 (9th Cir. 2001), [Dkt. 27 at 19 (applying _McDonnell Douglas_ standard)], and the _McDonnell Douglas_ standard is the prevailing standard within this Circuit, _see Yetman v. Cap. Dist. Transp. Auth._, 669 F. App'x 594, 595 (2d Cir. 2016) ("FMLA retaliation claims are . . . subject to the familiar burden-shifting framework of _McDonnell Douglas Corp. v. Green._") (internal citations omitted), _Alexander v. Bd. of Educ. of City of New York_, 648 F. App'x 118, 122 (2d Cir. 2016) (applying _McDonnell Douglas_ to an FMLA retaliation case).

#### i. Prima Facie _Case_

Under the _McDonnell-Douglas_ standard, the plaintiff must first demonstrate a _prima facie_ case, which requires proof of the following elements: "1) [she] exercised rights protected under the FMLA; 2) [she] was qualified for [her] position; 3) [she] suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." _Potenza_, 365 F.3d at 168. Eversource challenges only the fourth element.

Ms. Majocha was terminated within one day of taking her first Lyme-related FMLA leave. As a general matter, a plaintiff may rely on temporal proximity

between the exercise of FMLA rights and the alleged retaliation to establish "an inference of retaliatory intent." *See Donnelly v. Greenburgh Cen. School Dist. No. 7*, 691 F.3d 134, 152 (2d Cir. 2012) (finding a "'very close' temporal proximity" is a sufficient basis to create a "causal connection" between the protected activity and adverse action, constituting retaliatory intent); *Hewett v. Triple Point Tech., Inc.*, 171 F. Supp. 3d 10, 20 (D. Conn. 2016) (acknowledging that a temporal proximity of one month was sufficient to satisfy the *prima facie* elements); *Blackett v. Whole Foods Market Grp., Inc.*, No. 14-cv-1896 (JAM), 2017 WL 1138126, at *9 (D. Conn. Mar. 27, 2017) ("The temporal proximity between the time when plaintiff took his leave and his termination provides a sufficient basis for plaintiff to meet his 'minimal burden' of establishing this prong."); *DeCicco v. Mid-Atlantic Healthcare, LLC*, 2017 WL 3189034, --- F. Supp. 3d --- (E.D. Pa. 2017) ("Viewed in the light most favorable to Plaintiff, a reasonable jury could conclude that the timing of Plaintiff's termination [two days after submitting a request for FMLA leave] was "unusually suggestive" of a retaliatory motive to infer a causal link between his protected activity and the adverse action.").

In exercising its prerogative to evaluate the temporal proximity on a case-by-case basis, courts within this Circuit evaluate all of the facts and circumstances and have held that an inference of causation may be defeated if "there was an intervening causal event. . . ." *Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005); *see Villagomez v. Catholic Charities, Inc.*, No. 3:09 CV 1001 (JGM), 2010 WL 4929264, at *8 n.18 (D. Conn. Nov. 30, 2010) (applying *Yarde* rule to an FMLA case). In assessing the facts of this case, the Court finds that the

termination of Plaintiff's employment one day after her first exercise of FMLA leave is highly suggestive of retaliatory intent. Of particular note is the fact that Mr. Synan, one of the decision makers, knew Ms. Majocha believed she was suffering from symptoms associated with Lyme disease long before she was diagnosed and requested FMLA leave. In addition, he was familiar with the disease, its disabling effects, the long period of treatment and impact it would have on the function of his area of responsibility. These facts buttress the persuasiveness of the temporal proximity of Plaintiff's leave request and her termination.

### ii. *Legitimate, Non-Discriminatory Reason*

Defendant contends Ms. Majocha was terminated for her poor performance, which includes her bad attitude. [Dkt. 23 at 18; Dkt. 24-7 ¶ 11]. Poor performance and insubordination are legitimate non-discriminatory reasons to terminate employment. *See Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014) (reversing on the grounds of sufficient pretext, but acknowledging district court held defendant had "seemingly legitimate, non-discriminatory reasons for firing [plaintiff]—primarily, poor performance reviews and affidavits from three regional managers whom [plaintiff] supervised); *Jain v. McGraw-Hill Cos., Inc.*, 506 F. App'x 47, 48 (2d Cir. 2012) (stating plaintiff's poor work performance was a legitimate, non-discriminatory reason for terminating plaintiff's employment in an FMLA case); *Edwards v. City of New York*, No. 03 Civ. 9407(PAC), 2005 WL 3466009, at *15 (S.D.N.Y. Dec. 19, 2005) ("Insubordinate and unprofessional conduct is a legitimate, non-discriminatory reason for terminating an employee."); *Forrester v. Prison Health Servs.*, No. 12 CV 363(NGG)(LB), 2015 WL 1469521, at *15 (E.D.N.Y.

Jan. 5, 2015) ("Misconduct, excessive lateness, and poor performance are legitimate, non-discriminatory reasons for defendants' adverse actions.").

There is ample evidence that Eversource terminated Ms. Majocha's employment because Ms. Majocha failed to timely pay bills, take responsibility, and complete projects as requested. *See, e.g.,* [Dkt. 24-7 ¶¶ 7-9; Dkt. 24-10 at 66:22-67:3; Dkt. 24-14; Dkt. 24-15; Dkt. 24-17]. There is also evidence that she frustrated her supervisors with poor attitude and insubordinate behavior. *See, e.g.,* [Dkt. 24-7 ¶¶ 7-9; Dkt. 24-16]. Accordingly, Defendant has met its burden at the second stage of the *McDonnell Douglas* test.

### iii. *Pretext*

Given that there exists a legitimate, non-discriminatory reason for terminating Ms. Majocha's employment, Ms. Majocha would have to show the "proffered explanation is pretextual." *Graziadio*, 817 F.3d at 429. A reasonable juror can conclude the employer's reason for termination is "pretext for a prohibited reason" when the plaintiffs provides evidence "demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Id.* at 430 (quoting *Kwan v. Andalex Grp. LLC,* 737 F.3d 834, 846 (2d Cir. 2013)).

The totality of these circumstances in this case creates weaknesses, inconsistencies, and contradictions in Defendant's proffered reason for Mrs. Majocha's termination, establishing a triable issue of fact. First, Mr. Synan expressed concern about the effect Lyme disease would have on Ms. Majocha's

ability and availability to perform her job. Specifically, he expressed concern about her need to repeatedly see doctors and potential inability to quickly recover. [Dkt. 24-10 at 67:2-19], He even asked on three separate occasions how quickly antibiotics could alleviate her symptoms, [Dkt. 24-11 at 70:17-73:1]. Second, Mr. Synan began to notice Ms. Majocha's poor performance possibly as far back as 2012 but did not terminate her until immediately after she sought FMLA in June 2013. *See* [Dkt. 24-10 at 12:7-21, 13:16-14:3]. Third, he was aware that she was experiencing the symptoms of the disease, but did not suggest Eversource make a reasonable accommodation despite her declining performance and his knowledge that she would ultimately be stabilized.

It is also worth noting that Defendant did not put Ms. Majocha on a formal job performance counseling or stepwise discipline program despite the express NU Policy, which Defendant contends is permissive. [Dkt. 27-7; Dkt. 29 at 7]. Mr. Synan testified that he believed she was put on a stepwise discipline program. *See* [Dkt. 24-10 at 88:5-11], However, there is nothing in the record to support his contention. On the contrary, there is no evidence that any disciplinary program was reviewed by HR as required under the NU Policy, casting doubt on the credibility of his contention. *See* [Dkt. 27-7 at ES5014]. Indeed, Mr. Synan's email to himself on May 12, 2013, wherein he stated, "I refuse to enter a progressive discipline arrangement with Anne," indicates that no discipline program had been instituted even if it was discussed. *See* [Dkt. 27-8 at ES4226].

There also exists a genuine issue of material fact as to who actually made the employment decision. Mr. Peloquin submitted an affidavit wherein he stated

he "made the decision to terminate Anne Majocha's employment with Eversource because of [his] personal observations of her poor performance and poor attitude, and from reports [he] received from Michael Synan." [Dkt. 24-7 ¶ 11]. He also indicated that he "was not aware that Anne Majocha was suffering from Lyme disease or that she had made a request for FMLA leave." *Id.* ¶ 12. However, Defendant's First Set of Interrogatories identifies that "[t]o the best of Defendant's recollection, the decision to terminate plaintiff's employment was a joint decision involving Bernard Peloquin, Michael Synan, Anne Tavares, legal department and Nancy Lema sometime in late May 2013." [Dkt. 27-15 at 9]; *see* Fed. R. Civ. P. 56(c)(1)(A). It is undisputed that Mr. Synan was aware of Ms. Majocha's Lyme disease. *See* [Dkt. 24-10 at 33:14-23; Dkt. 24-11 at 71:5-21]. Both Ms. Lema and Mr. Synan received confirmation of Ms. Majocha's approval for FMLA leave on June 4, 2013. *See* [Dkt. 27-13]. Ms. Lema was present at the termination meeting. *See* [Dkt. 24-7 ¶ 11]. For the purposes of summary judgment, there is sufficient evidence for a reasonable juror to find that individuals making the termination decision were aware of Ms. Majocha's FMLA request and leave. *See Casseus v. Verizon N.Y., Inc.*, 722 F. Supp. 2d 326, 351 n.20 (E.D.N.Y. 2010) (finding in a disability discrimination and FMLA case, "triable issues of fact exist as to who the relevant decisionmakers were and what they knew" and noting "under the so-called 'cat's paw' theory of liability, 'the impermissible bias of a single individual can infect the entire group of collective decisionmakers,' . . . at least when the decisionmakers are overly deferential to the biased individual's recommendations").

**B.** *Statute of Limitations*

Defendant contends that Plaintiff's FMLA retaliation claim is time-barred because she did not file her case within two years of her termination.  In general, a plaintiff's FMLA claim must be filed within two years of the last alleged violation.  29 U.S.C. § 2617(c)(1).  The exception lies when the violation is "willful," in which case the case may be brought within three years of the last alleged violation.  29 U.S.C. § 2617(c)(2).  "Willful" is not defined under the FMLA, but the Second Circuit has adopted the definition set forth by the United States Supreme Court in the context of the Fair Labor Standards Act: "an employer acts willfully when he or she 'knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FMLA].'"  *Porter v. New York Univ. Sch. of Law*, 392 F.3d 530, 531 (2d Cir. 2004) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)).  An employer that "acts unreasonably, but not recklessly, in determining its legal obligation" should not be considered to have acted "willfully."  *Id.* at 531-32.

Plaintiff's alleged violation occurred on June 5, 2013 when she was terminated, [Dkt. 24 ¶ 27; Dkt. 27-2 ¶ 27], and she did not file this claim until May 17, 2016, [Dkt. 1 (Compl.)].  Therefore, notwithstanding the merits her claim is time-barred unless she can establish the retaliatory termination was "willful."

It is Plaintiff's position that an FMLA retaliation claim is "by definition 'willful.'"  [Dkt. 27 (Opp'n) at 18].  In support, Plaintiff cites *Offor v. Mercy Med. Ctr.*, 676 F. App'x 51 (2d Cir. 2017), which is a summary order that has no precedential effect.  Like Ms. Majocha, the plaintiff in *Offor* had filed her FMLA retaliation claim

after two years but before three years of the date the alleged violation occurred. *Id.* at 53. The Second Circuit vacated the dismissal and remanded the FMLA retaliation case, finding the plaintiff plausibly alleged an FMLA retaliation claim; it stated in a footnote that "retaliating against an employee for exercising FMLA rights is almost by definition a 'willful' violation." *Id.* at 54. However, *Offor* dealt with this issue at the motion to dismiss stage, and the Second Circuit addressed only the pleadings.

The Court will not adopt a three-year statute of limitations without assessing the sufficiency of the evidence as to the retaliation claim for two reasons. First, there is no clear authority in this circuit to do so. The Second Circuit in *Offor* said an FMLA retaliation claim was "almost by definition a 'willful' violation. *Offor*, 676 F. App'x at 51, which means it is more likely than not willful but not necessarily willful. Second, this Court agrees that to do so would essentially abrogate the purpose of the statute, which differentiates *willful* violations from those that are reasonable. *See McLaughlin*, 486 U.S. at 135 n.13. The contrary conclusion would violate a fundamental principle of statutory construction which is to give meaning to every term of a statute when reading the statute as a whole. *See Auburn Hous. Auth. v. Martinez*, 277 F.3d 138, 144 (2d Cir. 2002) ("The meaning of a particular section in a statute can be understood in context with and by reference to the whole statutory scheme, by appreciating how sections relate to one another. In other words, the preferred meaning of a statutory provision is one that is consonant with the rest of the statute."); *see also Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the

broader context of the statute as a whole."); *Garcia v. Teitler*, 443 F.3d 202, 207 (2d Cir. 2006) ("It is a basic rule of statutory construction that a court begin with "the plain and ordinary meaning of statutory terms.").

While the Second Circuit has not issued a published decision addressing "willfulness" at the summary judgment stage in an FMLA retaliation case, the Second Circuit in *Porter* relied on the First Circuit's "thoughtful opinion" in *Hillstrom v. Best Western TLC Hotel*, 354 F.3d 27, 33-34 (1st Cir. 2003) when adopting the FLSA definition of "willful" in the FMLA context. *See Porter*, 392 F.3d at 532. *Hillstrom* did involve an FMLA retaliation claim, and the First Circuit upheld the two-year statute of limitations determination made at the summary judgment stage. *Id.* In so ruling, the First Circuit stated, "Even assuming, without deciding, that there is evidence that Best Western decided to alter slightly Hillstrom's employment conditions because he took medical leave under the FMLA, there is no evidence that this constituted a 'willful' violation of the statute and thus no genuine question of material fact on the issue." *Id.* at 34.

The Court sees no reason to depart from *Hillstrom* and the general summary judgment standard without explicit direction from the Second Circuit to do so. *See Mejia v. Roma Cleaning, Inc.*, No. 15-cv-4353 (SJF) (GRB), 2017 WL 4233035, at *2 (E.D.N.Y. Sept. 25, 2017) ("However, while such allegations may be enough to avoid an early motion for dismissal, once discovery is completed, a plaintiff must have some evidence from which either a court or a reasonable fact-finder can find a willful FMLA violation."); *see generally Douyon v. New York City Dep't of Educ.*, 665

F. App'x 54, 57 (2d Cir. 2016) (declining to engage in the "willful" analysis because plaintiff failed to establish the merits of the FMLA retaliation claim).

There is a triable issue of fact as to whether Defendant's agents acted knowingly or with reckless disregard when determining its legal obligation for the termination. Ms. Majocha submitted the requests for FMLA leave on May 14, 2013, [Dkt. 24 ¶ 18; Dkt. 27-2 ¶ 18], and they were approved on June 4, 2013, [Dkt. 24-20]. Her employment was terminated just one day after she was granted and took her first FMLA leave for Lyme disease. [Dkt. 24 ¶ 27; Dkt. 27-2 ¶ 27]. At some point between 2012 and March 2013 Mr. Synan became aware of Ms. Majocha's symptoms and her belief that she had Lyme disease. *See* [Dkt. 24-10 at 33:14-23; Dkt. 24-11 at 71:5-21]. He knew it could take Ms. Majocha considerable time to eradicate her symptoms, that she needed to frequently go to the doctor, and Ms. Majocha testified that Mr. Synan asked her on multiple occasions how quickly the antibiotics would work. [Dkt. 24-11 at 35:7-12, 70:17-73:1]. There is a triable issue of fact as to whether Mr. Synan participated in the termination decision, but Ms. Lema was physically present during the termination and she had been notified of Ms. Majocha's FMLA leave. It is therefore the jury's role to decide whether these facts and the others discussed previously in this decision are sufficient to warrant a "willful" violation of the FMLA.

IV. Conclusion

For the aforementioned reasons, summary judgment is DENIED as to Count I and GRANTED as to Count II. The parties are reminded to file their Joint Trial

Memorandum on or before March 2, 2018, as set forth in the operative scheduling order. The Clerk is directed to refer this case to Magistrate Judge Robert A. Richardson for settlement.

IT IS SO ORDERED.

_____ /s/ _____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut:  February 21, 2018